In re Monica D. **HARENBERG**, Debtor.

In re D & M Realty, LLC, Debtor.

Nos. 10–23223–RAG, 10–23222–RAG.

United States Bankruptcy Court, D. Maryland, at Baltimore.

April 8, 2013.

Adam Hiller, Hiller & Arban, LLC, Wilmington, DE, for Debtor.

Lori S. Simpson, Law Office of Lori Simpson LLC, Baltimore, MD, for Trustee.

Hugh M. Bernstein, Edmund A. Goldberg, Mark A. Neal, Office of U.S. Trustee, Baltimore, MD, for U.S. Trustees.

## MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING DEBTORS' MOTION FOR STAY PENDING APPEAL

ROBERT A. GORDON, Bankruptcy Judge.

### I. Introduction

Pending before the Court is the Debtors' Motion for Stay Pending Appeal (Motion for Stay) (Dkt. No. 132) filed on December 3, 2012.[1] The U.S. Trustee (UST) filed its Opposition to Debtors' Motion for Stay Pending Appeal (Dkt. No. 140) by the deadline agreed upon by the parties and the matter is now ripe for decision.[2]

The Motion for Stay seeks to bring the underlying bankruptcy proceeding to a full stop while the Debtors' appeal three orders. Each order was issued after this Court's October 24, 2012 oral ruling that (a) denied approval 'with prejudice' of the Amended Disclosure Statement, (b) decided that the Third Amended Plan of Reorganization of D & M Realty, LLC and Monica D. Harenberg (Amended Plan) (Dkt. No. 110) could not be confirmed and (c) held that a trustee should be appointed to administer this estate.[3] Those orders

---

1. As indicated in the Debtors' Disclosure Statement Regarding Third Amended Plan of Reorganization (Amended Disclosure Statement) (Dkt. No. 111), D & M Realty, LLC (D & M) is presently a shell entity with only a nominal amount of cash ($7,000) to its name. The real estate that it had an interest in was liquidated during bankruptcy and it was left owing a substantial deficiency claim to CFG Community Bank (CFG). Therefore, when the Debtor is referred to in this Opinion, it will mean Monica D. Harenberg unless otherwise indicated or when the plural form is used.

2. On December 12, 2012, the Debtors and the UST entered into a Stipulation and Consent Order Extending Deadline for U.S. Trustee and Chapter 7 Trustee to Object to Debtors' Motion for Stay Pending Appeal (Dkt. No. 136). The parties agreed to February 11, 2013 as the deadline for filing a response to the Motion for Stay.

3. The Amended Disclosure Statement and Amended Plan are actually the fourth iterations of plans and disclosure statements filed by the Debtors. One pair (Dkt. Nos. 65 and

are, the Order Disapproving Debtors' Disclosure Statement and Denying Confirmation of Debtors' Third Amended Plan Without Leave to Amend (Disclosure Statement Order) (Dkt. No. 118), the Order to Show Cause as to Why a Chapter 11 Trustee Should Not Be Appointed (Show Cause Order) (Dkt. No. 119) and the Order Denying Debtors' Motion for Partial Reconsideration, Sustaining Order to Show Cause as to Why a Chapter 11 Trustee Should Not be Appointed and Converting the Cases to Cases under Chapter 7 (Conversion Order) (Dkt. No. 125).[4]

## II. Preliminary Statement

■ Monica Harenberg owns and manages a real estate enterprise that includes several valuable income producing properties. For the past two and a half years, she has proven herself incapable of prosecuting this case in good faith and it is elementary that a plan proponent's lack of good faith is fatal to the confirmation process. Her single-minded effort to protect her own (and her parents') economic interests to the complete exclusion of the interests of her substantial body of general unsecured creditors bears this out in compelling fashion. The Amended Plan and Amended Disclosure Statement confirm the worst by (a) proposing to pay no more than a total of $9,500 over a period of five years to an unsecured class of creditors holding claims of well over one million dollars, (b) granting Juanita Harenberg

(Ms. Harenberg's mother) a fee simple co-interest in real estate held free and clear and worth approximately $140,000, in addition to a junior 'priming' lien against the rest of the Debtor's real estate, and (c) proposing to keep for Ms. Harenberg all residual equity (and future upside potential) in her income producing assets, most, if not all, of which she stubbornly persists in claiming to be "exempt" from creditor claims contrary to governing law.

■ These outrageous proposals exemplify Ms. Harenberg's approach to the administration of her case, an approach at cross purposes with her fiduciary responsibilities. With that in mind, this Court found that the Amended Plan does not comply "with the applicable provisions of" the Bankruptcy Code and has not been "proposed in good faith" as required by 11 U.S.C. § 1129(a)(1) and (3).[5] Moreover, the Amended Plan violates the liquidation test of Section 1129(a)(7) as well as Section 1123(a)(4)'s prohibition against unfair discrimination among creditors of the same class.[6] This Court therefore decided that the Amended Plan could not be confirmed, the Amended Disclosure Statement could not be approved, and, moreover that Ms. Harenberg is incapable of ever proffering a plan that complies with the Code and is rooted in good faith. The appointment of a trustee to insure that the rights of creditors—especially the rights of general creditors—are protected thus became the only reasonable alternative.[7] Accordingly, the

---

67) was withdrawn before consideration by the Court.

4. Both the Disclosure Statement Order and the Show Cause Order were entered on October 28, 2012. The Conversion Order was entered November 20, 2012.

5. Unless otherwise noted, all statutory citations shall be to the Bankruptcy Code (Code) found at Title 11 of the United States Code and all rule citations are to the Federal Rules of Bankruptcy Procedure (Rules).

6. The Amended Plan also violates Section 1129(a)(11) which bars confirmation if it is likely to be followed by liquidation. The Amended Disclosure Statement acknowledges this, indicating that, "the [Amended Plan] would lack sufficient funding without infusions of capital from" the Debtor's mother.

7. The Court originally intended to appoint a chapter 11 trustee but decided to convert the case to Chapter 7 at the urging of the UST. In

Court concludes that the Motion for Stay should be denied.

## III. Background

### (a) Ms. Harenberg's Statement of Financial Affairs and Schedules and her Unlawful Effort to Exempt all of her Equity

The Court summarized Ms. Harenberg's lack of good faith in its October 24, 2012 oral ruling. Her stark track record—culminating in the Amended Disclosure Statement and Amended Plan—is this case's singular problem. That problem first manifested in her original Statement of Financial Affairs and Schedules (SOFA and Schedules) and it was underscored by her outrageous attempt to exempt from the estate over one million eighty thousand dollars in asset value.

█ Ms. Harenberg filed her Voluntary Petition on June 11, 2010.[8] On April 27, 2011, she and D & M filed their Disclosure Statement Regarding Plan of Reorganization of D & M Realty, LLC and Monica Harenberg (First Disclosure Statement). The Court held a hearing on the adequacy of the same on June 14, 2011 and that resulted in the entry of the Memorandum Opinion referred to in footnote 8. The choices Ms. Harenberg made in crafting her SOFA and Schedules (particularly her Schedule C—Exemptions) were deeply relevant to the question presented by the First Disclosure Statement: whether she had afforded her creditors adequate information to enable them to make an informed decision regarding the version of her plan then pending such that the confirmation process could move forward upon a foundation of full, honest disclosure.[9] The core problem was described in the Memorandum Opinion as follows:

Ms. Harenberg filed her Statement of Financial Affairs (HSOFA) and Schedules (Harenberg Schedules) on July 9, 2010 (Dkt. No. 40). Accompanying them was a document entitled General Notes Regarding the Schedules (Harenberg General Notes). As explained in footnote 15, *supra*, above regarding the RPH General Notes, the Harenberg General Notes likewise present a cavalcade of disclaimers and renouncements of the accuracy of the HSOFA and Harenberg Schedules. If accepted at face value, they render the HSOFA and Harenberg Schedules meaningless. However, the Harenberg General Notes potentially carry much more impact than do the RPH General Notes at this stage of the case. In short, they make it impossible for creditors to know with certainty whether the proposed plan is either proposed in good faith or satisfies the liquidation test of Section 1129(a).

Specifically regarding Ms. Harenberg's claimed exemptions in her Sched-

---

lieu of reconsideration, the Debtor likewise supported conversion.

**8.** Initially, these two cases were (at the request of the Debtors) jointly administered with a third case, Robert's Plumbing and Heating, LLC (Robert's Plumbing) filed at Case No. 10–23221. Robert's Plumbing was the lead case until it was dismissed at that Debtor's request. Robert's Plumbing made that request to avoid compliance with the rulings set forth in the Memorandum Opinion in Support of Order Denying Approval of Debtors' Disclosure Statements (Memoran-

dum Opinion) entered on July 20, 2011 (Dkt. No. 206; Case No. 10–23221).

**9.** Section 1125 prohibits debtors from soliciting creditor acceptance of their reorganization plan unless and until the court approves the proffered disclosure statement as including adequate information. *See In re Microwave Products of America, Inc.*, 100 B.R. 376, 377 (Bankr.W.D.Tenn.1989); *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr.N.D.Ga.1984).

ule "C", the Harenberg General Notes state as follows:

> *Book Value of Property Interests.* It would be prohibitively expensive and unduly burdensome to obtain current market valuation of the Debtor's properly interests and other significant assets. Accordingly, unless otherwise noted, the value of assets reflected on the Schedules are merely the Debtor's best guess as to their value, rather than current market value or other valuation methodologies. *In Schedule C and its exhibits, the Debtor has asserted an exemption on 100% of the Debtor's right, title, and interest in each and every asset listed on that schedule, except as otherwise expressly provided. Stated values are not intended to act as a limitation of the amount or proportion of value in which the Debtor asserts an exemption. To the extent that any exemption exceeds the maximum value of exemptions by law, the Debtor asserts that the cushion created by undervaluation of some assets will permit the excess but reserves the right to amend Schedule C to apply the exemptions differently.*

(Dkt. No. 40, pgs. 2–3). Schedule "C" attempts to exempt a total of *$1,046,759* in real estate and *$34,297* in personal property. To call this an act of bad faith would be a gross understatement. Recognizing this, on August 20, 2010, CFG filed its Objection by CFG Community Bank to Debtor Monica D. Harenberg's Claim of Exemptions (Exemption Objection) (Dkt. No. 81). The specific grounds underlying the Exemption Objection can be summarized as follows:

a. That Ms. Harenberg's exemptions exceeded the dollar amounts allowed by law;

b. That the exemptions as claimed are impermissibly ambiguous or non-specific; and

c. That Ms. Harenberg is not entitled to exempt property titled as Tenant's–By–The Entirety as Ms. Harenberg and her non-filing spouse have joint debts.

Ms. Harenberg neither requested a hearing on the Exemption Objection nor did she file a response to the same. On May 19, 2011, the Court entered the Order Sustaining Objection by CFG Community Bank to Debtor Monica D. Harenberg's Claim of Exemptions (Exemption Order) (Dkt. No. 185). In pertinent part the Exemption Order provided,

The Objection is well taken and no response has been filed. Moreover, the Objection in part relies upon the Debtor's use (through incorporation) of a document entitled 'General Notes Regarding the Schedules' (Dkt. No. 40) filed by the Debtor as a general, all purpose disclaimer to her Schedules (Dkt. No. 40). This document appears to be purposefully obtuse and calculated in part to absolve the Debtor from any responsibility for the facts set forth, and affirmed under oath, in her Schedules. In light of the multiple layers of uncertainty that result from this tactic, in addition to the overall merit of the Objection, the Objection will be sustained and the claimed exemptions vacated in their entirety.

On June 2, 2011, Ms. Harenberg filed the Debtor's Motion for Reconsideration (Reconsideration Motion) (Case No. 10–23223, Dkt. No. 37) which sought to convince the Court to reverse itself and vacate the Exemption Order. The grounds set forth in the Reconsideration Motion are not well-taken. However, for purposes of this Memorandum Opin-

ion, and the preparation of future disclosure statements, if any, the Court's reasoning boils down to the following: to vacate the Exemption Order and reinstate Ms. Harenberg's exemptions would throw the confirmation process into mind-bending uncertainty. Ms. Harenberg's claimed exemptions are unsustainable whether Schedule "C" is viewed alone or as reflected by the funhouse mirror of the Harenberg General Notes. *Without certainty regarding Ms. Harenberg's exemptions, and the value of property exempted, creditors have no way of discerning or evaluating the value of property to be distributed under the plan and thereby determine whether liquidation would be the better outcome.* Hence, the consequences of both Schedule "C" and the Harenberg General Notes are disruptive in the extreme. As long as they hold sway, Ms. Harenberg's proposed plan is unconfirmable and any proposed disclosure statement cannot be approved.

Ms. Harenberg is entitled by law to exemptions. The Exemption Order specifically recognized this by offering her the opportunity to amend the vacated Schedule C. Until her exemptions are properly selected and defined in a manner allowed by law, and the smokey (sic) veil of the Harenberg General Notes is cleared away, her next disclosure statement cannot be evaluated in any meaningful way.

Mem. Op. 16–19 (emphasis added).[10]

▮▮▮ Honesty is the consideration that a debtor must pay in exchange for the immense protection afforded by the Code. In keeping with that policy, the purpose of the statement of financial affairs and schedules is to provide a transparent view of the Debtor's assets, liabilities and financial affairs at the time bankruptcy is filed. The degree to which any bankruptcy case can be properly and efficiently administered is directly proportional to the level of honesty imbued in those documents and the responsibility to provide the necessary candor falls squarely on the debtor's shoulders.[11] With these bedrock principles providing context, Ms. Harenberg's General Notes could only have been prepared with one purpose in mind: to baffle and bamboozle creditors in derogation of their right to receive clear, accurate, straightforward information. And while the General Notes' confounding overall impact was bad enough, the difficulty was multiplied exponentially by the Debtor's attempt to simultaneously exempt over one million eighty thousand dollars in asset value. Why would Ms. Harenberg attempt to claim such a huge, unlawful exemption? Simply put, if no timely objection was filed, then the original exemptions could have become fixed and invulnerable to attack.[12] However, CFG's objection checked the Debtor's first attempt at this gambit. Approval of the First Disclosure Statement was therefore withheld because of (a) the grossly (and purposefully) confused state of the record due to the General Notes, (b) the unlawful exemptions and (c) the Debtor's failure to disclose a mélange of relevant financial information. Between the General Note's fog and the exemptions' haze, accurate information as to the state

---

**10.** A copy of Ms. Harenberg's General Notes is attached as Appendix I.

**11.** There is no doubt that Ms. Harenberg's counsel is well aware of these fundamental precepts of bankruptcy law.

**12.** *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–44, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (If a party in interest fails to object to property claimed as exempt within the period allowed by Rule 4003(b) then the property 'is exempt' per Section 522(*l*) even if the claimed exemption is otherwise illegitimate.).

of Ms. Harenberg's financial affairs, especially the value of any equity, could not be gleaned. Accordingly, the Debtors were given ninety (90) days to file an amended disclosure statement and plan.[13]

Ms. Harenberg filed an Amended Schedule C on November 16, 2011 [14] (Dkt. No. 263; Case No. 10–23221). All of the real estate parcels listed (save one) were valued at '$1' or '$0' for exemption purposes while the personal property exemptions were mixed: some items of property were assigned very specific dollar amounts of exempt value while others were assigned exemption values of either '$1' or '$0'. However, notwithstanding the superficial appearance of thoughtful selection, Ms. Harenberg's overriding intent was made clear by the inclusion of a single footnote. It read:

> Except as otherwise indicated, the Debtor's exemption of an asset is intended to include *100% of the Debtor's right, title and interest in and to such asset.* Values are approximate and reflect only the Debtor's good-faith belief in the value of the Debtor's interest in the asset (net of any existing liens, mortgages, and other encumbrances).

(Am. Sch. C, Ex. C–1 (emphasis added).)

Thus, the Debtor still intended to try and exempt all available equity and her quagmire of a case quickly tumbled back to square one. The UST objected to Amended Schedule C and properly sought to "limit the debtor to those exemptions allowed by law" (Dkt. No. 272; Case No. 10–23221).[15] On February 14, 2012 a hearing to consider the objection was held. Getting to the heart of the matter, the Court again emphasized that it would be impossible for the Debtor to obtain disclosure statement approval as long as she persisted in playing 'fast and loose' with the law governing exemptions. She was cautioned that if her exemptions were not pared down to fit the governing legal boundaries then the Court would, "*sua sponte* consider whether a trustee should be appointed." At the hearing's close, the Court ruled as follows:

> I'm going to give the debtor 15 days to file an amended Schedule C. And this is the debtor's last opportunity to amend the Schedule C and any other schedules that need to be amended in a legitimate, lawful way. The law regarding which there could not be any doubt whatsoever in anybody's mind in this courtroom except perhaps the debtor herself . . . And then I'm going to give you 60 days from today to file an amended plan and disclosure statement.

(Hr'g Tr. 24, Feb. 14, 2012.)

On February 28, 2012 the Debtor filed her third Schedule C with the offensive footnote deleted. On its face, this iteration of Schedule C did not attempt to exempt all of Ms. Harenberg's equity. However, when considered in combination with the

---

**13.** The Memorandum Opinion closed with this caution,

> The information provided in the two Disclosure Statements falls well below the minimum standard and the inclusion of outlandish provisions without rational basis has only inspired strict scrutiny. The rulings in this Memorandum Opinion are intended to reflect that conclusion and should be interpreted as such.

Mem. Op. 21.

**14.** A modified version of the 'General Notes' was filed with the Amended Schedule C which only served to compound the confusion.

**15.** By the time Amended Schedule C was filed, the Debtor had entered into a proposed settlement with CFG, the prior objector. It is therefore likely that the Debtor hoped the Amended Schedule C would slip under the radar without objection thus reaping the undeserved benefit of *Taylor*'s holding.

Amended Disclosure Statement and Amended Plan filed on August 31, 2012, it became evident that Ms. Harenberg was still bent upon trying to do just that while leaving her general creditors little more than crumbs.

### (b) The Amended Disclosure Statement and Amended Plan

### 1. The Treatment of Juanita Harenberg, the Debtor's Mother

The Amended Disclosure Statement indicates that the Debtor owns, free and clear of liens and encumbrances, a fifty *per cent* (50%) interest in Baltimore City real estate known as 2823 St. Paul Street (2823 St. Paul).[16] The Amended Disclosure Statement assigns an approximate value of $140,000 to her interest.[17] In response to question 14 of her SOFA, the Debtor asserted that she held title to this real estate as an "accommodation". The Amended Disclosure Statement indicates that she owns the interest as a "convenience", at least until the day her father passes away. What happens after that is not disclosed. No documents were submitted with the Amended Disclosure Statement to either confirm or explain the underlying nature of the alleged grant and why Ms. Harenberg characterizes her ownership interest this way. Nor does the Amended Disclosure Statement include an informative narrative explanation. Nevertheless, the Amended Disclosure Statement goes to great lengths to try and explain why this interest has no value to the estate, mainly relying upon the alleged difficulty a purchaser of her share would have in generating income.

■ To be blunt, this Court is of the opinion that the Amended Disclosure Statement's verbiage on this topic is hogwash pure and simple, conjured up to deceive creditors. Section 363(h) is intended to manage this precise circumstance by allowing a trustee to sell a parcel of real estate that is co-owned by a non-debtor if certain conditions are met. There is no apparent obstacle to the application of Section 363(h) to 2823 St. Paul and there is little doubt that a competent trustee could quickly and efficiently employ the statute to administer and liquidate the real property for the benefit of the estate. Notwithstanding Section 363(h)'s obvious impact and the benefit its utilization would bring to general creditors, the Amended Disclosure Statement does not mention that subsection. Instead, the Amended Plan proposes to deed the Debtor's fifty *per cent* interest *to her mother* in exchange for "past consideration" (alleged unsecured loans) and an alleged agreement to subsidize the Debtor's performance under the Amended Plan. Over and above that largesse, the Amended Plan also proposes to grant the Debtor's mother a "priming" lien to be secured by the rest of the Debtor's real estate which lien would rise in value with each new loan.[18] These benefits would accrue notwithstanding the indication on the Debtor's SOFA that her mother may have been the recipient of at least $90,000 in preferential payments during

---

**16.** The other fifty *per cent* (50%) is apparently owned by Ms. Harenberg's father. The Debtor originally sought to exempt her half interest from the estate through the machinations described above.

**17.** The portion of the Amended Disclosure Statement that describes the Debtor's interests in real property and the corresponding claims of secured creditors is attached as Appendix II.

**18.** The Amended Disclosure Statement does not disclose any other 'loan' terms.

the twelve months prior to the filing of the case.[19]

Ms. Harenberg's mother is *at best* an average creditor who may have made unsecured loans before the bankruptcy filing. The exalted status proposed for her under the Amended Plan has no rational basis and, as will be explained below, amounts to a *prima facie* violation of Section 1123(a)(4)'s anti-discrimination provisions. Accordingly, this Court concluded that the treatment afforded her mother was nothing more than additional confirmation of the Debtor's bad faith.

### 2. The Amended Plan's Treatment of General Creditors

The Debtor's Amended Plan proposes to pay her general unsecured creditors, with claims totaling over one million dollars, a grand total of nine thousand five hundred dollars ($9,500), *payable in installments*, over five years. In contrast to this proposal, the Debtor's Amended Schedule B—Personal Property (Dkt. No. 263, Case No. 10–23221) assigns a total value of $57,719 to her non-real estate assets. Of this, the Debtor has exempted a total of $27,973

leaving approximately $29,746 of non-exempt equity.[20] As for the Debtor's real estate, the analysis begins with 2823 St. Paul Street and her fifty *per cent* interest valued at $140,000. In addition, properties identified as 2918–20 N Calvert Street (2918 Calvert) and 2822 St. Paul Street (2822 St. Paul) were valued by the Debtor at $450,000 and $280,000 respectively, while the Amended Disclosure Statement fixes the respective lien interests against these two parcels at approximately $400,000 and $170,427.36.[21] Combined, these three real properties alone may hold equity of approximately $299,572.64, a sum substantially more than what was being offered to general creditors.[22] When the liquidation value of personal property is added in, the correct choice becomes crystal clear: immediate liquidation is an infinitely better option for general creditors. Nevertheless, the Debtor asserts as to all three of the real estate parcels discussed above that she has "included this property on her schedule of exemptions as being *completely exempt* from being property of the estate". (Am. Disclosure Statement 6–

---

**19.** The payments are listed in response to Question 3c of the SOFA. The preference period would extend to one year prior to the petition date for Ms. Harenberg's mother, who is an insider. *See* Section 547(b)(4)(B). Yet, the Amended Disclosure Statement does not discuss the payments received by Ms. Harenberg's mother. This may be because the Amended Plan also proposes that post confirmation, all right, title and interest to any claims or causes of action of the estate shall become property of the Debtor for her to pursue or not pursue as she sees fit in her sole discretion.

**20.** The Debtor also listed allegedly valueless ownership interests in business entities known as Village Properties and Star Management and a contingent future interest in the Juanita T. Harenberg Trust (Trust). Scant information was provided as to these interests and their value save for the representation that the Debtor receives income from the

business entities and that the Trust would be donating valuable real estate as security to close one of the settlements that the Debtor proposed to enter into with a secured lender.

**21.** Ms. Harenberg declined to obtain appraisals of several other parcels of real estate deeming the cost "prohibitive".

**22.** Ms. Harenberg asserts in the Amended Disclosure Statement that any real estate equity may be consumed by the confessed judgment lien in favor of CFG. However, the Amended Disclosure Statement did not inform creditors that per the Debtor's settlement with CFG, its lien would be released upon the payment of relatively nominal sums by Ms. Harenberg and her co-settling parties. The Order Approving Settlement Agreement with CFG Community Bank Pursuant to Fed. R. Bankr. 9019 was entered on December 5, 2011 in Case No. 10–23221 at Dkt. No. 273.

7 (emphasis added).) Indeed, at page 11, the Amended Disclosure Statement states,

> In her Liquidation Analysis, Ms. Harenberg exempted all of her real property, as reflected in Schedule C.... Ms. Harenberg believes that the exempt values of those real properties are accurate and that a ... trustee would therefore not be able to liquidate those assets for the benefit of creditors.

(Am. Disclosure Statement 11.)

The Debtor comes full circle with that representation to bring us right back to the original and inherent problem of bad faith. She is simply not entitled to exempt all of her assets from the claims of her general creditors and to state otherwise is a gross misrepresentation of fact and law.[23]

## IV. Legal Standards

▪▪▪ An appellant who seeks a stay pending appeal must show that:

> (1) there is a likelihood of success on the merits of the appeal; (2) she will suffer irreparable injury if the stay is denied; (3) other parties will not be substantially harmed by the stay; and (4) the public interest will be served by granting the stay.

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977) *rev'd on other grounds, Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir.2009); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir.1970); *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Engineers*, 890 F.Supp.2d 688, 690 (S.D.W.Va.2012).[24] The burden rests on the moving party to establish each element, *Long*, 432 F.2d at 979, and this Court concludes that Ms. Harenberg has satisfied none of them.

### a. Whether the Debtor has a Likelihood of Success on the Merits

In order to achieve plan confirmation, a debtor must satisfy the applicable elements of 11 U.S.C. § 1129(a). In this case, the relevant provisions provide:

> (a) The court shall confirm a plan only if all the following requirements are met:
>
> (1) The plan complies with the applicable provisions of this title.
>
>         * * *
>
> (3) The plan has been proposed in good faith and not by any means forbidden by law.
>
>         * * *
>
> (7) With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the

---

**23.** This point was addressed in *In re Forti*, which stated, "the mechanisms employed by the debtors could be tantamount to fraud if they assigned a nominal value in order to exempt a high-valued asset of the estate on the basis of the difficulty of valuation." 224 B.R. 323 (Bankr.D.Md.1998) (discussing *Addison v. Reavis*, 158 B.R. 53 (E.D.Va.1993).).

**24.** The Court in *Ohio Valley* endeavored to determine what, if any, impact *The Real Truth* decision had on the criteria for granting a stay pending appeal in light of *The Real Truth*'s revision of the preliminary injunction standard. The *Ohio Valley* court concluded that for purposes of securing a stay pending appeal, (1) a party need not make an independent showing as to each prong of the test, (2) that a weaker position on one of the prongs may be buttressed by the factoring in of significantly stronger position on others and (3) a strong showing of likelihood of success on the merits (as opposed to a showing of a 'serious question' presented) was needed to secure a stay pending appeal. 890 F.Supp.2d at 692–93. In this case however, Ms. Harenberg fails on each of the test's four prongs.

effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

\* \* \*

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . .

\* \* \*

11 U.S.C. § 1129(a). Supplementing the foregoing, Section 1123(a) specifies certain rules that a Chapter 11 plan must follow. Subsection (a)(4) provides that, "a plan shall—(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest". 11 U.S.C. § 1123(a).

While it is true that the October 24, 2012 hearing was a disclosure statement (and not a confirmation) hearing, the Amended Disclosure Statement and the Amended Plan are woven of the same fabric and together are fatally defective. The Amended Disclosure Statement was found wanting because of the material, deceptive inaccuracies described in Section III above but even more so because of the scheme (constructed upon those deceptions and memorialized in the Amended Plan) that on its face violates Sections 1129(a)(1) and (3). Applicable law bars Ms. Harenberg from exempting all of her property yet that is exactly what the Amended Plan proposes to do. Likewise, her effort to perfect those exemptions—an effort that has spanned the entire case—in the face of

objections and adverse court rulings, and under cover of obfuscation and deception, is a textbook example of bad faith. Furthermore as regards the general unsecured creditor class's treatment, it is plain that (a) the exalted treatment afforded the Debtor's mother is grossly discriminatory in violation of Section 1123(a)(4) and (b) they will receive vastly more upon liquidation than they would per Ms. Harenberg's proposal, a circumstance that places the Amended Plan squarely at odds with 1129(a)(7).[25]

■ A disclosure statement that describes a plan that cannot be confirmed—one that is incapable of satisfying Section 1129(a)—cannot be approved. *In re 266 Washington Associates,* 141 B.R. 275, 288 (Bankr.E.D.N.Y.1992), aff'd, *In re Washington Associates,* 147 B.R. 827 (E.D.N.Y. 1992); *In re Pecht,* 53 B.R. 768, 772 (Bankr.E.D.Va.1985); *In re Eastern Maine Elec. Co-op., Inc.,* 125 B.R. 329, 333 (Bankr.D.Me.1991); *In re Kehn Ranch, Inc.,* 41 B.R. 832, 833 (Bankr.D.S.D.1984). There is no sound reason to approve a disclosure statement, and permit voting on an underlying plan, when the plan is fundamentally defective. *In re Valrico Square Ltd. Partnership,* 113 B.R. 794, 796 (Bankr.S.D.Fla.1990) ("[S]oliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties."); *In re Eastern Maine Elec. Co-op., Inc.,* 125 B.R. at 333 ("[T]he disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal

---

**25.** While Sections 1123(a)(4) and 1129(a)(7) allow creditors to choose to vote in favor of suffering monetary discrimination for the benefit of a fellow class member, or receiving less than they would upon liquidation, the Court found the Debtor's proposals too grossly inadequate to be considered. This is so because the Debtor used deception to try and convince creditors that the Amended Plan's proposal was the best they could expect. Without an honest evaluation, creditors would not be an informed voting constituency and their choice would be borne of fraud and ignorance.

facial deficiencies or the stark absence of good faith.").[26]

The Debtors offer no legal authority that undercuts this Court's finding of bad faith and it is upon that fact finding that the Court's decision rests. This boils down to the Debtor having convinced the Court beyond repair that she will use any means necessary to try and keep the estate's substantial equity for herself (and her parents) and will not provide a fair distribution to general creditors. Any credibility she may have had has evaporated long ago. Notwithstanding the events that preceded the Memorandum Opinion and its clear message that she was bound to conduct herself as a fiduciary, Ms. Harenberg has continued to be ruled by avarice. She cannot lawfully exempt the vast bulk of her assets, she cannot treat her mother to an exalted status over other general creditors, and she cannot pay those general creditors less than 1% of their claims over five years while she continues to reap the benefits of her extensive real estate portfolio. To conclude otherwise would be tantamount to replacing Section 1129(a) with the epitaph, "Laissez les bons temps rouler."

■ The Motion for Stay does not address the Court's finding of fact as to a lack of good faith and the Debtor's failure to comply with applicable law.[27] Instead, the Debtor's arguments can be summarized as follows:

(a) There was "little or no equity" in the "real property" in the Debtor's estate and the proposed plan would have "fairly apportioned value to her creditors, including a larger return to unsecured creditors than they would receive in a Chapter 7 liquidation;

(b) That all affected creditor classes would have voted to accept the plan and therefore creditors should have been given the opportunity to vote on the plan;

(c) That liquidation of the Debtor's assets is not in the best interest of creditors because the trustee does not have the resources to manage and market the real estate and therefore secured creditors will seek to liquidate their collateral;

(d) That this Court had no authority to deny confirmation without leave to amend and the Debtor may file a plan "at any time" without limitation from the Court;

---

**26.** In *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010), the Supreme Court emphasized that a bankruptcy Court must follow relevant statutory directives before confirming a Chapter 13 plan. The Court stated:

§ 1325(a) instructs a bankruptcy court to confirm a plan only if the court finds, *inter alia*, that the plan complies with the "applicable provisions" of the Code.

\* \* \*

[T]he Codes makes plain that bankruptcy courts have the authority—indeed the obligation—to direct a debtor to conform his plan to the requirements of §§ 1328(a)(2) and 523(a)(3).

260 S.Ct. at 1380. Justice Thomas further indicated in footnote 14 that Section 1325(a),

"does more than codify this principle: it *requires* bankruptcy courts to address and correct a defect in a debtor's proposed plan even if no creditor raises the issue." *Id.* at 1381, n. 14. The relevant language of Section 1129(a)(1) is virtually identical to that of Section 1325(a)(1). In short, this Court offered Ms. Harenberg multiple opportunities to conform her reorganization efforts to the Code's express boundaries but each offer has been rejected by her terminal overreaching.

**27.** An inquiry into good faith is a factual one geared to a consideration of the totality of the circumstances. *Behrmann v. Nat'l Heritage Foundation*, 663 F.3d 704 (4th Cir.2011).

(e) That the Court erred as a matter of law by making findings of fact and conclusions of law with respect to whether the plan could be confirmed at the hearing on the adequacy of the disclosure statement;

(f) That the Court erred by making findings of fact with respect to the value of the Debtor's assets without receiving evidence on the same; and finally

(g) That the Debtor should have been permitted to form a creditor's committee to represent the unsecured creditor body and allow "the Debtors and their estates [to] propose a plan that would be acceptable to all classes."

■■■ As regards subheadings (a), (c) and (f), the Debtor's own documents belie the Debtor's contention. The property analyses and values relied upon were derived from either the Amended Disclosure Statement or the SOFA and Schedules. The relative values show there is a wealth of equity and therefore creditors will do substantially better in liquidation than they would waiting five years to be paid only 1% of their claims. Moreover, the trustee appointed—Lori Simpson, Esquire—is more than capable of managing, administering and liquidating the estate's assets. This case is neither the easiest nor the hardest ever before this Court. Plainly, there is nothing to indicate that creditors will not be paid within a reasonable time assuming competent administration. This Court doubts that "all creditor classes" would have been in favor of the Amended Plan. But even if by some strange turn of events the Debtor received votes in favor of the Amended Plan from general creditors, for the reasons explained above, the Court would not have confirmed the Amended Plan due to the Debtor's bad faith, the violation of applicable law and the Amended Disclosure Statement's deceptive nature. The rest of the Debtor's contentions are rebutted by the settled legal principles regarding fatally flawed plans outlined above and Section 1129(a)(3)'s mandate that good faith must be found in order to confirm a plan.[28] It is the Debtor's obligation to proceed in good faith and proffer a plan that reflects that and creditors should not have to wait for the creation of a creditor's committee for her to gain the inspiration to do so. Accordingly, the Court concludes that the appeal has no likelihood of success on the merits.

### b. Whether the Debtor will Suffer Irreparable Injury if the Stay is Denied

The requested stay is denied with the Court's clear understanding (and hope) that liquidation will begin immediately. Ms. Harenberg complains that this will "prejudice" her interests.[29] In response, as Judge Winter wrote in *Long,*

---

**28.** On appeal, the Court's findings regarding the lack of good faith will be reviewed for clear error. *Behrmann v. Nat'l Heritage Foundation,* 663 F.3d at 709. Debtors have failed to make a showing that, on appeal, they will be likely to show clear error in the Court's finding of bad faith.

**29.** Debtor also alleges that creditors will be harmed by liquidation as she will not be able to pay secured lenders in accordance with pending consent agreements. The Court expressly declined to approve any of the consent agreements awaiting decision at the October 24th hearing. Moreover, upon liquidation the secured lenders will receive the value of their collateral, which is all they are entitled to receive as recompense for the secured value of their claims. As explained in this Opinion, unsecured creditors should fare exceedingly well as compared to the $9,500 over five years that the Debtor proposes to pay them.

[T]he principal irreparable injury which defendants claim they will suffer if the order is not stayed is injury of their own making. The defendant ... has postponed the moment of truth as long as possible, but the moment of truth is now at hand. It would seem elementary that a party cannot claim equity in his own defaults.

432 F.2d at 981.

It is Ms. Harenberg's stubborn wrongheadedness that has resulted in the adverse rulings now on appeal. Creditors have been held at bay long enough. This Court finds no prejudice whatsoever in the imposition of justice long delayed.

*c.   Whether Other Parties will not be Substantially Injured by the Stay*

Ms. Harenberg's creditors will be substantially injured by the entry of a stay. In sum, they have waited for two and a half years while Ms. Harenberg and her counsel have wasted time and money with misdirection and deception. The time has come for this case to move toward its ultimate conclusion and for creditors to be paid.

*d.   Whether the Public Interest will be Served by the Grant of the Stay*

The public interest in this instance falls squarely on the side of honesty and forthrightness in judicial proceedings. Ms. Harenberg has shown neither. In bankruptcy, no crime is worse. Accordingly, the public interest is against the grant of the stay.

## V.   Conclusion

Ms. Harenberg has dictated her own fate in this case. Her actions eliminate the possibility of a finding of good faith under Section 1129(a)(3). Accordingly, a separate order denying the Motion for Stay shall be entered.

**SO ORDERED.**

## APPENDIX I

Monica D. Harenberg, debtor in possession (the "Debtor"), hereby submits her Schedules of Assets and Liabilities, Statements of Financial Affairs, and Chapter 11 Statement Of Current Monthly Income (collectively, the "Schedules") pursuant to 11 U.S.C. § 521 and Fed. R. Bankr.P. 1007. The notes, statements, and disclaimers made herein (the "Global Notes") are fully incorporated by reference in, and comprise an integral part of, the Schedules and should be referred to and reviewed in connection with any review of the Schedules.

*GENERAL NOTES REGARDING THE SCHEDULES*

1. *Description of the Case and "As Of" Information Date.* On June 11, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition"). Since the Petition Date, the Debtor has operated her business and managed her property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. For purposes of the Schedules, which are intended to relate to facts or events occurring before the filing of the Petition, the Debtor disclosed all facts or events through and including June 11, 2010. The Debtor also attempted to include facts and events that occurred on the Petition Date but prior to the actual filing of the Petition, but to the extent that any such facts or events were inadvertently omitted, the Debtor reserves the right to amend the Schedules to correct any such

defects. The Debtor's bankruptcy case is jointly administered with the Chapter 11 cases of two other debtors, and these Schedules are not intended to refer to those debtors.

2. *Unaudited Financial Information.* While the Debtor has sought to ensure that the Schedules are accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information or any audit may result in material changes to financial data and other information contained in the Schedules. Except as otherwise certified, all of the data set forth herein is unaudited. The Schedules do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to correspond to any financial statements otherwise prepared and/or distributed by the Debtor. The amounts set forth in the Schedules may differ in some respects from financial statements or other financial documents prepared by, for, or on behalf of the Debtor and those differences may be material.

3. *Accuracy.* While the Debtor has sought to file complete and accurate Schedules, inadvertent errors and omissions may exist. Accordingly, the Debtor reserves the right to amend the Schedules as necessary or appropriate.

4. *Book Value of Property Interests.* It would be prohibitively expensive and unduly burdensome to obtain current market valuation of the Debtor's property interests and other significant assets. Accordingly, unless otherwise noted, the value of assets reflected on the Schedules are merely the Debtor's best guess as to their value, rather than current market value or other valuation methodologies. In Schedule C and its exhibits, the Debtor

has asserted an exemption on 100% of the Debtor's right, title, and interest in each and every asset listed on that schedule, except as otherwise expressly provided. Stated values are not intended to act as a limitation of the amount or proportion of value in which the Debtor asserts an exemption. To the extent that any exemption exceeds the maximum value of exemptions by law, the Debtor asserts that the cushion created by undervaluation of some assets will permit the excess but reserves the right to amend Schedule C to apply the exemptions differently.

5. *Liabilities.* In preparing the Schedules, the Debtor sought to allocate liabilities between prepetition and postpetition periods based on ongoing information and research. As additional information becomes available and further research is conducted, the allocation of liabilities between prepetition and postpetition periods may change and the Schedules may be amended accordingly.

6. *Claim Description.* Any failure to designate a claim on the Schedules as "contingent," "unliquidated," or "disputed" does not constitute an admission by the Debtor that such claim is not "contingent," "unliquidated," or "disputed." The Debtor expressly reserves the right, on her own behalf or on behalf of the estate, to dispute, or to assert offsets or defenses, to any claim reflected on the Schedules as to existence, validity, amount, classification, priority, or security, or to amend the Schedules to designate any claim as "contingent," "unliquidated," or "disputed." The Debtor has attempted to reconcile each of the claims against her own records and to dispute those with which its records disagree, but in the event the Debtor subsequently determines that any claims listed on the Schedules as "undisputed" are

inconsistent with its books and records, the Debtor reserves the right to amend the Schedules to reflect that such claims are disputed, or to object to such claims without amending the Schedules if she determines that amending the Schedules is unnecessary.

7. *Executory Contracts and Unexpired Leases.* In the ordinary course of her business, the Debtor may have leased real property and/or various articles of personal property from third-party lessors. Such leases are described in the Schedules, but the leased property may not be reflected in the Schedules as assets of the Debtor or property or assets of third parties within the control of the Debtor. On or before the Petition Date, any such contracts or leases listed on Schedule G may have been terminated, may have expired, or may have been modified, amended, or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the contracts or leases listed on Schedule G may contain renewal options, guarantees or payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights, which may or may not be set forth on Schedule G. Certain executory contracts may not have been memorialized and could be subject to dispute. Executory contracts that are oral in nature, if any, have been scheduled to the best of the Debtor's knowledge. Additionally, the Debtor may be party to various other agreements concerning real property, such as easements, rights of way, purchase options, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements, and such agreements, if any, may not be set forth in Schedule G.

Moreover, certain of the agreements listed on Schedule G may be in the nature of conditional sales agreements or secured financings. Nothing in the Schedules should be construed as an admission or determination as to the legal status of any lease or contract, including but not limited to: (i) whether the Debtor intends to assume, assume and assign, or reject any unexpired lease or executory contract; (ii) whether any interest described (or identified on the face of the controlling documents) as a lease constitutes a true lease or a financing arrangement; (iii) whether any lease was unexpired on the Petition Date; and (iv) whether any contract was executory on the Petition Date. The Debtor reserves all of her rights, claims and causes of action with respect to the contracts and leases listed on, or omitted from, the Schedules.

8. *Secured Claims.* Listing of a claim on Schedule D as a secured claim does not constitute an admission by the Debtor that such claim is secured. Any descriptions of claims, security, collateral, or value provided in Schedule D are intended only as a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent and priority of any liens securing each claim listed on Schedule D. The Debtor reserves the right to dispute any claim listed on Schedule D as to amount, liability, or its classification as a secured claim. Moreover, the listing of a claim on Schedule D as a secured claim does not constitute an admission by the Debtor that to the extent such claim is secured, such claim is perfected or otherwise enforceable against

property of the estate as a security interest, lien, interest, mortgage, or other encumbrance.

9. *Claim Amounts.* The amount of claims of individual creditors for, among other things, merchandise, goods, services, or taxes are scheduled in accordance with the amounts invoiced by the creditors as entered on the Debtor's books and records and may not reflect credits or allowances due from such creditors to the Debtor. The Debtor reserves all rights with respect to any such credits and allowances including without limitation the right to assert claims objections and/or setoffs with respect to same. The dollar amounts of claims listed may be exclusive of contingent and unliquidated amounts.

10. *Causes of Action.* The Debtor has set forth all known causes of action against third parties as assets in the Schedules. Due to the timing of the filing of the Schedules and the fact that not all causes of action may have been clearly identified, the Debtor reserves all rights with respect to any causes of action that she may have, regardless of whether and how disclosed. Neither these Global Notes nor the Schedules shall be deemed a waiver or limitation of any such causes of action. Moreover, the inadvertent failure to list a particular cause of action in the Schedules is not an admission that such cause of action does not exist and the Debtor reserves the right, at any time, to amend the Schedules to include any cause of action that was omitted. **No person reviewing the Schedules should conclude or infer that a cause of action not listed in the Schedules does not exist or has been waived, released, discharged, or otherwise extinguished, and any reliance upon such a conclusion or inference is expressly unreasonable.**

11. *Satisfied Claims.* The Debtor may have satisfied, and may in the future satisfy (to the extent permitted by law), certain debts that may have constituted claims as of the Petition Date. For example and not by way of limitation, the Bankruptcy Court may enter orders authorizing the Debtor to pay certain claims incurred prior to the Petition Date, some of which may be entitled to priority treatment under 11 U.S.C. § 507. To the extent that the Debtor made payments on or after the Petition Date as permitted under the applicable orders, the recipients may not be listed in the Schedules. The inclusion of any claim on the Schedules or Statements should not be construed as an admission that such claim was not satisfied on or after the Petition Date, and the inclusion or exclusion of certain claims that were satisfied on the Petition Date shall not constitute an admission that all such claims were included or excluded. Furthermore, payment by the Debtor of any prepetition claim does not constitute an admission or estoppel that such payment was authorized by the Court or the Bankruptcy Code, and the rights of the Debtor's estate to avoid and recover such payments is expressly preserved regardless of how such claim may appear on the Schedules.

12. *Insiders.* At certain points, the Schedules require the disclosure of information pertaining to insiders of the Debtor. Because it is often unclear who might constitute insiders of the Debtor as that term is defined by 11 U.S.C. § 101(31), the Debtor has attempted to be over-inclusive in the Schedules in disclosing information about (i) entities that may ultimately be deemed insiders by the Court, and (ii) the Debtor's transactions with, and relationships to, such entities. Nothing in the Schedules should be construed as an ad-

mission that such entities are insiders of the Debtor.

13. *Co–Defendants.* Schedule H contains a list of the parties that may be co-debtors on account of claims or obligations of the Debtor. Parties listed on this schedule may not have consented to their inclusion on this schedule and no estoppel has been thereby created, including but not limited to the individual(s) that signed and/or verified the Schedules. When it was uncertain whether a party was a co-debtor, the Debtor erred on the side of including it and reserves the right to amend the schedules in this regard. The Debtor did not include any party that is merely a co-defendant in litigation with the Debtor unless such party has agreed to assume the Debtor's liability arising therefrom.

14. *Specific Notes.* These Global Notes are in addition to any specific notes set forth in the Schedules.

15. *Submission of Counsel.* The execution below of counsel is for submission of these Global Notes only and does not constitute a statement under oath of the validity of the matters set forth in the Schedules.

Dated: July 9, 2010  
Wilmington, Delaware

Respectfully submitted,

PINCKNEY, HARRIS & WEIDINGER, LLC

/s/ **Adam Hiller**  
Adam Hiller (Fed. Bar No. 25301)  
1220 North Market Street, Suite 950  
Wilmington, Delaware 19801  
(302) 504–1497 telephone  
(302) 442–7046 facsimile

*Proposed Attorneys for the Debtor*

## APPENDIX II

### DISCLOSURE STATEMENT REGARDING THIRD AMENDED PLAN OF REORGANIZATION OF D & M REALTY, LLC AND MONICA D. HARENBERG

some of the attorney's fees incurred in this Chapter 11 case. Those funds are currently held in the attorney trust account of D & M's prior law firm, Pinckney, Harris & Weidinger, LLC.

### B. *Monica D. Harenberg.*

As explained herein, Ms. Harenberg owns numerous parcels of rental real estate throughout Maryland and North Carolina (collectively, the "Harenberg Properties"). In addition to owning the Harenberg Properties, she manages them, as well as properties of other unrelated parties, through a non-debtor management company that she owns and operates called Star Management. She is also a 50% member of D & M, but because that entity has only nominal cash and $451,478.02 in deficiency claims, she asserts that that interest has no value.

In providing the values for the Harenberg Properties, Ms. Harenberg relied

upon third party opinions or appraisals. Except with respect to the property located at 2900 S. Laurel Fork, Ms. Harenberg relied upon the same appraisals or appraisers as the secured lenders in this case in obtaining the values set forth below.

The following are the Harenberg Properties as of the Petition Date:

1. *2743 St. Paul St., Baltimore, Maryland.* This property is residential rental real property, in which Ms. Harenberg has a 100% interest. Due to recent renovations, this property has 5 leasable units. As set forth on the chart attached hereto as *Exhibit 3* and the appraisal attached as *Exhibit 4,* the original appraiser on behalf of Midstate Federal Savings & Loan ("Midstate") recently updated an earlier appraisal and has provided a current estimated value of $270,000.00 on this property. Midstate has a first-priority secured claim against this property, scheduled as an undisputed secured claim in the amount of approximately $571,874.00. In a recent filing, Midstate asserted that its claim is "approximately $600,000.00." As described below, the CFG Judgment may constitute a lien on this property, which would be junior in priority to Midstate's deed of trust, for the unpaid deficiency amount of D & M's obligations referenced above. This loan is also secured by a deed of trust against certain real property owned by Juanita Harenberg and located at 2936 St. Paul Street.

Because the amount of Midstate's claim exceeds the current estimated value of this property, Ms. Harenberg believes that there is presently no equity in this property. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

Midstate appeared in this case and filed a motion for relief from the automatic stay in connection with this property. Ms. Harenberg and Midstate entered into a stipulation and consent order with Midstate, which is more fully described below and incorporated into the terms of the Plan.

2. *2918–20 N. Calvert St., Baltimore, Maryland.* This property is residential rental real property, in which Ms. Harenberg has a 100% interest. This property has 10 leasable units. As set forth on the chart attached hereto as *Exhibit 3* and the updated appraisal attached as *Exhibit 5,* the original appraiser on behalf of Midstate recently updated an earlier appraisal and has provided a current estimated value of $450,000.00 on this property. Midstate has a first-priority secured claim against this property, scheduled as an undisputed secured claim in the amount of approximately $381,249.00. In a recent filing, Midstate asserted that its claim is "approximately $400,000.00." As described below, the CFG Judgment may also constitute a lien on this property, junior in priority to Midstate's deed of trust, for the unpaid deficiency amount of D & M's obligations referenced above, but the Debtor believes that that lien may be avoidable.

Because the aggregate amount of Midstate's claim and the CFG Judgment lien exceeds the current estimated value of this property, Ms. Harenberg believes that there is presently no equity in this property. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

The stipulation and consent order between Ms. Harenberg and Midstate described above will also govern the Plan's treatment of Midstate's claims in connection with this property.

3. *164 Mountain View Lodge Drive, Glendale Springs, NC 28607.* This property is a large parcel of rental real property containing a lodge and several cabins, in which Ms. Harenberg has a 50% interest with her husband as tenancy by the entireties. A recent appraisal obtained by Bank of Granite, a copy of portions of which is attached hereto as *Exhibit 6,* suggests that the value may be approximately $800,000.00.[3] Bank of Granite has a first-priority secured claim against this property, for which it has filed a proof of claim in the amount of $935,906.05. Ms. Harenberg's obligation to repay Bank of Granite is personally guaranteed by her husband, as well as by Juanita Harenberg.

As described below, Bank of Granite appeared in this case and aggressively sought relief from the automatic stay to exercise its non-bankruptcy rights and remedies against this property, as well as to restrict Ms. Harenberg's use of rents received from that property. To resolve those disputes, Ms. Harenberg and the guarantors entered into a settlement agreement with Bank of Granite during this case, which is more fully described below and incorporated into the terms of the Plan.

Because the aggregate amount of Bank of Granite's claim exceeds the current estimated value of this property, Ms. Harenberg is taking the position that there is presently no equity in this property. Moreover, because this property is owned as tenancy by the entireties and her husband is not a debtor in bankruptcy, Ms. Harenberg has taken the position that it would be exempt from property of the estate except to pay joint creditors of herself and her husband. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

4. *2822 St. Paul St., Baltimore, Maryland.* This property is a single-family home serving as Ms. Harenberg's principal residence with her non-debtor spouse. An updated appraisal, performed by the same appraiser used by Midstate and attached hereto as *Exhibit 7,* sets forth an estimated value of $280,000.00 as of September 1, 2011. Branch Bank & Trust Company ("BB & T") holds a first-priority deed of trust against this property, and the current principal balance is $145,427.36. CFG holds a second-priority deed of trust against this property, for which Ms. Harenberg has scheduled it a claim in the amount of $25,000.00. As described herein, CFG has the CFG Judgment which is a judgment lien on this property that would be junior in priority to BB & T's deed of trust and CFG's deed of trust, for the unpaid deficiency amount of D & M's obligations referenced above.

Because the aggregate amount of claims exceeds the current estimated value of this property, Ms. Harenberg is taking the position that there is presently no equity in this property. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

5. *2900 S. Laurel Fork, Laurel Springs, North Carolina.* This property is a parcel of rental real property containing three rental cabins, in which Ms. Harenberg has a 50% interest as tenancy by the entireties with her non-debtor spouse.

---

**3.** A portion of the Bank of Granite appraisal is attached hereto as **Exhibit 6.** The remaining portion of this appraisal is available from counsel to the Debtors upon request. Ms. Harenberg investigated a more recent valuation from the appraisal service that performed the Bank of Granite appraisal. Due to the prohibitive cost, this is the most recent appraisal available as of the date of this disclosure statement.

Ms. Harenberg was unable to procure an appraisal of this property but estimates the value of this property to be $280,000.00.[4] Highlands Union Bank has a first-priority secured claim against this property, for which it has filed a proof of claim in the amount of $271,989.04.

Because the aggregate amount of Highlands Union's claims are almost equal to the current estimated value of this property, Ms. Harenberg is taking the position that there is presently only nominal equity in this property. Moreover, because this property is owned as tenancy by the entireties and her husband is not a debtor in bankruptcy, Ms. Harenberg has taken the position that it would be exempt from property of the estate except to pay joint creditors of herself and her husband. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

6. *2313 S. Laurel Fork, Laurel Springs, North Carolina.* This property is a parcel of real property located in an extremely rural area, in which Ms. Harenberg has a 100% interest. Ms. Harenberg believes that she could rent out this property but estimates that the monthly income that could be generated from this property is no more than $600.00 per month due to its location. Attached as *Exhibit 8* hereto is an appraisal dated April 26, 2011, reflecting an estimated value of this property of $310,000.00. Highlands Union Bank has a first-priority secured claim against this property, for which it has filed a proof of claim in the amount of $310,201.50.

Because the aggregate amount of Highlands Union's claims are almost equal to the current estimated value of this property, Ms. Harenberg is taking the position that there is presently only nominal equity in this property. Therefore, she has included this property on her schedule of exemptions as being completely exempt from being property of the estate.

7. *2823 St. Paul Street, Baltimore, Maryland.* This property is residential rental real property with 3 leasable units, in which Ms. Harenberg has a 50% interest given to her by her father, with an understanding that she would hold the property for his benefit as a convenience until his death (he remains alive). An appraisal of a 100% undivided interest in this property, updated on September 1, 2011, and attached as *Exhibit 9* hereto sets forth a value of $280,000.00. Juanita Harenberg owns the other 50% interest. The appraisal also provides that the value of Ms. Harenberg's interest is $0.00 in this property due to the lack of a market for such a fractional ownership interest.

Ms. Harenberg agrees with the appraiser's view on the value of this fractional asset for a number of reasons. Ms. Harenberg is not in possession of this property, and it was deeded to her as an estate planning accommodation by her father who remains alive. Conventional purchasers would not be interested in purchasing a partial interest in real property from a co-owner that does not have physical possession. She does not expect to receive any income or other value from this property while her father is alive. Moreover, if such interest were sold, neither the hypothetical purchaser of Ms. Harenberg's 50% interest nor Juanita Harenberg

---

4. The value provided by Ms. Harenberg is a good faith estimate of the value of this property based upon an earlier consultation with a real estate professional broker in the locale.

Ms. Harenberg investigated the option of a thorough appraisal of this property but was quoted a prohibitive cost.

would own the majority necessary to make management decisions such as how to distribute cashflow. Thus, neither owner could receive a return on investment absent the consent of the other. Regardless of whether the partners agree to distribute cashflow, to the extent that the property's income exceeds its expenses, the partners would be deemed for tax purposes to have earned a profit despite the fact that they received no cashflow with which to pay the taxes on that profit. Ms. Harenberg believes that no buyer would purchase a fractional property interest ripe for litigation or pay for the obligation to pay taxes on income without receiving the income. In addition, Ms. Harenberg does not know of a broker willing to list a 50% interest in property and does not believe that a market exists for partial interests of this nature, especially given the likelihood of litigation between co-owners after the acquisition. Under these circumstances, Ms. Harenberg believes that the value of this property interest on the Petition Date was, and continues to be, $0.00.

Because the value of this property interest is $0.00, Ms. Harenberg has included this property on her schedule of exemptions as being completely exempt from being property of the estate. As described below, however, if this property interest does have value, there is a possibility that a Chapter 7 trustee could realize value from it.

**Harenberg Performance Since Bankruptcy**

Since the Petition Date, Ms. Harenberg has continued to use her properties as investments to generate rental income, with the exception of the properties located at 2822 St. Paul Street, Baltimore, Maryland and the one located at 2313 S. Laurel Fork Road, Laurel Springs, North Carolina. With the assistance of her accountant and counsel, Ms. Harenberg has generated profit and loss statements for each of the properties set forth above, with the exception of her residence. Moreover, Ms. Harenberg is providing summaries for each property (with the exception of her residence) and for herself personally concerning the average net income generated before and after the Petition Date. These spreadsheets are collectively attached hereto as *Exhibit 1.*

With respect to *Exhibit 1,* the following should be taken into consideration when analyzing the profit and loss statements and any summaries thereto:

(i) The average postpetition income of the 2743 St. Paul St, Baltimore, Maryland property has declined, while the other properties set forth have increased in income since the Petition Date.